VINAL, Adm'r, etc., *v.* CONTINENTAL CONSTRUCTION & IMP. Co.

*(Circuit Court, N. D. New York.* October 20, 1887.)

1. CONTRACTS—PROOF OF.
Where the evidence showed that plaintiff's intestate had a conversation with some of defendant's directors on a certain day, at which time it was alleged by him a contract was made; that intestate was the president of a railroad company: that the statements of the only witness to the contract varied at different times; that the agreement which plaintiff claims was made involved several millions of dollars; and no writing was then made, but, upon subsequent occasions, contracts made with the defendant by intestate, for the railroad company which he represented, covered the undertakings at first discussed, and were written in detail,—the evidence is not sufficient to sustain an allegation that defendant and intestate entered into an oral contract in favor of the latter personally.

2. SAME—WITH CORPORATION—LEGALITY OF CORPORATION—BREACH OF CONTRACT.
Where it appeared that if a certain contract, between plaintiff's intestate and defendant, were really made, it was a contract to build a railroad of the "Consolidated Boston, Hoosac Tunnel & Western Railway Company," of which intestate was president,—the stock and bonds of which company were to pay for the road; and that the formation of this company was shortly afterwards declared void, and its stock, bonds, etc., worthless: *held,* that defendant was released from performing such contract for a company that had never legally existed, and that it was also released from all obligation to intestate to build a road for such a corporation.

This action is to recover $1,500,000 damages alleged to have been suffered by the plaintiff's intestate, William L. Burt, because of the failure of the defendants to perform certain contracts made by them with the said Burt, and also with the Boston, Hoosac Tunnel & Western Railway Company, (a corporation of which Burt was president and chief promoter,) to build a railroad across the state of New York. This railroad was never built. The plaintiff insists that the contracts were violated solely through the fault of the defendants. The defendants maintain—*First,* that they made no contract with Burt, and that his representatives cannot, therefore, recover for a breach of the contract with the railway company; and, *second,* that the breach by them was unavoidable and excusable, and was caused by the negligence and mismanagement of Burt in failing to properly organize the railway company, and by reason of his conduct in other respects, which put it out of their power to perform. The other facts appear sufficiently in the opinions of the court.

The cause came on for trial before the Honorable ALFRED C. COXE and a jury at a term of the court held at Utica, New York, on the twenty-

sixth day of March, 1886. At the close of the plaintiff's evidence, the defendants moved the court to direct a verdict in their favor. After hearing argument, the court delivered the following decision.

*Matthew Hale, Edward W. Paige,* and *William H. Bright,* for plaintiff.

*Thomas H. Hubbard, Edward D. Mathews,* and *William Allen Butler, Jr.,* for defendant.

"COXE, J., (*orally.*) It is to be regretted that upon a motion of this character more time is not allowed for the thorough and complete examination which its importance demands. The presence of the jury, however, makes such an examination impossible, and it becomes the duty of the court to decide it upon the spot. It must, of course, be a decision upon first impressions,— impressions formed during the trial, and upon this argument. It should at all times be borne in mind that there is here no allegation of fraud on the part of the defendant. The action is *ex contractu* in character, and the rights of these parties must be determined by the contract or contracts which are in evidence. These contracts must be construed in the light of surrounding circumstances. The parties must be held to have entered into their agreements, having in view what was at the time the known *status* of affairs; they contracted in the light of what they then understood to be existing facts.

"Upon the twenty-fifth of May, when the alleged oral contract was made, and upon the twenty-sixth of May, when the written contract was entered into, what was the *status* of the parties to these contracts? It appears that General Burt had, by virtue of a previous contract with Ames and Dexter, and an extension thereof, procured the right to control the constituent or foundation company, viz., the original Boston, Hoosac Tunnel & Western Railway Company, by the payment of a large sum of money, beyond his power, as an individual, to pay. He was, by virtue of the Ames & Dexter agreements, given the option to take the stock of that railway company, and control its future action.

"The railroad at that time had been constructed from its eastern terminus to Mechanicsville on the eastern bank of the Hudson river. Also, at that time, May, 1881, the construction company (this defendant) had entered into an agreement by which it was to increase its capital stock to the amount of ten million dollars, for the purpose of building the road to Buffalo. That amount had been subscribed; assuming that the subscription made by General Burt is to be regarded as a part of the sum total. 'The list, including the three million dollars which he subscribed, was filled up upon the twenty-sixth of May, 1881. Upon the question as to whether or not the transfer of the Ames & Dexter contracts is to be regarded as a full payment by General Burt of fifty per cent. of the three millions subscribed by him, I have no doubt whatever. In view of the evidence of Mr. Foster, and in view of the fact that the subscription paper signed by General Burt contained no clause upon that subject, and in view of the other fact that the only subscription paper which does contain the clause upon which the plaintiff's contention is based was never signed by any one, it cannot be held, and there is no question of fact upon this branch of the clause to submit to the jury, that Burt was entitled to a credit of fifteen hundred thousand dollars without paying a dollar in cash. It seems to have been the understanding of all the parties, and a fair construction of the agreement itself, that the only preference to be given to General Burt was that he was to have two years in which to pay, whereas the other signers were required to pay forthwith.

"Again, at the time of which I speak, May, 1881,—and the contracting parties must be considered to have had this in contemplation,—General Burt, as the chief mover and promoter, had effected a consolidation of various cor-

porations, or alleged corporations; thus extending the franchise of the foundation company, so that it might extend its line from Rotterdam, across the state, to the city of Buffalo, or the international bridge at that point, with various branches north and south.   The name of the new corporation was the same as the old, viz., the Boston, Hoosac Tunnel & Western Railway Company.   The consolidation was drawn up in March, 1881, and filed on the eleventh of April, 1881, in the office of the secretary of state.   It was believed by all parties, at the time these agreements were entered into, that there was a valid consolidated company, having a charter under which the road could be constructed from the western terminus of the original Boston, Hoosac Tunnel & Western Railway Company through the state of New York.   Having these facts in mind, upon the twenty-fifth of May, General Burt met the board of directors of the defendant at the office of the company.   The testimony of Mr. Foster is that upon that day, the board being in session, and General Burt being present, there was a conversation on which it is sought to predicate an agreement between General Burt and the defendant that the latter should build the road or a road through the state to Buffalo.

"It is contended upon the part of the defendant that there is not enough of this transaction, assuming that the conversation as detailed by Mr. Foster took place, to constitute a contract.   It is argued that, in any view, the language was so vague and uncertain as to terms that the court cannot say, or submit it to the jury to say, that a valid contract was entered into at that time.   It is also asserted that, upon the undisputed testimony, the alleged contract was void under the statute of frauds, as an agreement not to be performed within two years.   It is indisputably proved that no formal vote of the board of directors was taken upon that occasion.   And it is, of course, true, that when the parties met together upon the day following, the 26th, to put in writing and formally sign the agreement between them, no mention was then made of the alleged agreement of the day preceding, and not a word regarding it was incorporated in the written paper.   But, in any aspect of the case, the parties must be deemed to have acted in view of existing facts, and therefore this agreement of May 25th, assuming now that it was made, was an agreement, not to do an indefinite, vague, and intangible thing, not to build a road whether there was a franchise to build it or not, but an agreement to build a road for the consolidated Boston, Hoosac Tunnel & Western Railway Company, under the consolidation referred to.   Surely it was in this respect no more valid or binding than the subsequent agreement in writing, which was entered into formally between the railway company and the defendant on the eleventh of August, 1881.

"Upon the twenty-sixth of May the agreement, which it is conceded upon both sides must measure the rights of these parties, at least so far as damages are concerned, was entered into between General Burt and this defendant.   By the terms of this contract, General Burt agreed to assign, and did assign, all his right, title, and interest under the Ames & Dexter contracts; thus giving the defendant the right, practically, to control the constituent or foundation company.   The defendant agreed with General Burt to deposit with the Central Trust Company of New York thirty thousand shares of its capital stock, to be taken and paid for by him at any time within two years.   To this extent the subscription which General Burt had signed was, so far as these parties are concerned, modified by this agreement.   The agreement further recited that for every thousand dollars which should be paid in by General Burt he should receive a consolidated gold bond of the railway company, and twenty shares of defendant's stock half paid; and that upon paying the full amount of the subscription, that is, the three million dollars, he should receive two of the bonds of the railroad company, and, upon surrendering the half-paid stock, twenty shares of the stock of the construction company, full paid.

General Burt, on his part, promised to subscribe three million dollars to the stock of the construction company. Upon the eleventh of August following, the railway company entered into a formal agreement with the construction company, by which the terms upon which the railroad was to be built were set out at great length, and attached to it were specifications for building the road from Rotterdam to Buffalo, or the international bridge, with the various branches, etc. At that time, therefore, August 11, 1881, there existed the agreement of May 26th, and, for the purposes of this motion, the agreement of May 25th also, and the contract with the railroad company to construct the road. The latter contract was signed by the Boston, Hoosac Tunnel & Western Railway Company, by its president, William L. Burt. I believe it is in proof, conceded, that he was president of the company at that time only by virtue of the articles of consolidation. It is conceded that General Burt never paid a dollar upon his subscription, unless, of course, the assignment of the Ames & Dexter contract is to be regarded as payment, and I have already disposed of that branch of the case; therefore it is entirely clear that his representatives have no right whatever under the contract of May 26th, unless it can be shown that the action of this defendant put it out of the power of General Burt and his administrators to perform that agreement. If that be true, it is possible that the rule quoted by the counsel for the plaintiff applies; the law would not then require of General Burt or his representatives to do a vain or inconsequential act. So that the controversy is narrowed down to the proposition whether or not there was a breach of this contract, upon the part of the defendant, and, if so, whether it was a breach which was unavoidable and excusable so far as the defendant was concerned.

"It appears that in the spring of 1883, a few months after the contract was made to construct the road, the attorney general of the state of New York, in the name of the people of the state, filed a bill for the purpose of having declared void the consolidation of the railway company, and for the purpose of having the bonds issued by the company delivered up as invalid, and canceled; also to enjoin any further proceedings under the franchise or agreement of consolidation. In March of that year the attorney general delivered a formal opinion, in which he clearly states the grounds upon which his suit proceeded, holding that the consolidation was wholly illegal, and that all acts under it must be so construed; that the railway company with which defendant contracted never had a legal existence, and that all its acts were void. When that opinion was delivered, this railroad company, if not dead, was stricken with legal paralysis; it was moribund. It seems quite clear that pending that action this defendant was not required to proceed under its contract. It was not called upon to construct a railroad for the consolidated company when the question whether or not it was a legal corporation was trembling in the balance. Had the defendant so proceeded, and had the subsequent action of the court been taken, all the bonds and all of the stock of the railway company transferred to it would have been invalid, and the defendant would have been required to give them all up for cancellation. The attorney general's suit proceeded to trial. I do not know that it appears precisely when the trial took place, but I believe it is alleged in the answer that the action was tried at the Chenango circuit in December, 1882. At any rate, in July, 1883, a decree was entered, as sweeping in its terms as it is possible to make a decree, holding the consolidation illegal, and all acts of the railway company void. The bonds were declared invalid, and the company was directed to give them up for cancellation, together with the stock.

"The question, then, is, first, did this defendant perform its agreement? To that, of course, there must be a negative answer. But, in view of all the facts and circumstances disclosed by the proof; in view of the action of the

attorney general holding that this consolidation was void from its inception, followed as it was by the decree of the supreme court deciding the whole proceeding null and void,—I must hold that the breach of the construction company was an excusable one, and that in the circumstances it would have been madness for it to have proceeded under a void agreement, with the danger threatening that all the securities issued by the railway company might be declared null and void. It is said that the railway company and the defendants might—and it is very probable the proposition is true—have made a new agreement of consolidation, or that they might have taken up these constituent companies by virtue of leases subsequently made; but the answer to that proposition has been suggested by counsel, and it is that this is an action upon contract, a contract made in May, 1881, and that defendants were under no obligation, by the terms of this contract, to take any step looking to the formation of a valid corporation. Fairness may have required them to proceed in that way, but under the contracts, which are set out in the pleadings, and proved by the testimony, there is nothing requiring them to organize another company, or to take up the constituent companies by leases subsequently made. The judgment of the supreme court, declaring the railway company void from its organization, must be regarded as relating back to all acts done by the company,—the making of the contract for building, the issuing of the mortgage, etc.; and I fail to see how the construction company could have performed its agreements to build the road in the face of such difficulties. These views must lead to the granting of the motion.

"Gentlemen of the jury, as the court has decided, as matter of law, that there is no cause of action, you will render a verdict in favor of the defendant."

Subsequently, the plaintiff moved for a new trial upon a bill of exceptions. The motion was argued at Albany, July 19, 1887, and was submitted upon printed briefs in September following.

*Matthew Hale* and *Edward W. Paige*, for the motion.

*Thomas H. Hubbard, contra.*

COXE, J. It is well not to lose sight of the fact that this is an action at law to recover damages for the breach of an alleged contract. In such an action the court is not permitted, in the adjustment of the rights of litigants, to exercise the comprehensive powers which appertain to a court of equity.

The questions to be determined are: *First.* Was a valid contract entered into between General Burt and the defendant? *Second.* If such a contract was made, did General Burt perform it, and the defendant violate it, and, if so, was the defendant's breach excusable?

The theory of the plaintiff is that there was an independent verbal agreement made May 25, 1881, between General Burt and the defendant, by virtue of which the defendant bound itself to build a railroad for General Burt across the state of New York. That the preliminaries to such a gigantic undertaking as was then in contemplation could be arranged without extended preparatory discussion is, of course, impossible. There was undoubtedly a conference between General Burt and the directors of the defendant on the twenty-fifth of May; but did the conversation on that day crystalize into the agreement referred to? The presumption is, certainly, a strong one, that the occurrences of the 25th

were only a part of the preliminary negotiations leading up to and merged in the formal written agreements of May 26th and August 11th. That men of affairs, versed in business usages, engaged as they were in an enterprise of great magnitude, should have made a contract involving millions, and left the proof to depend upon the fallible memory of man, is well-nigh incredible. Not a word appears in the minutes of the defendant on the 25th, or at any subsequent time, indicating the existence of such a contract. The written agreements of May 26th and August 11th are explicit, complete, and unambiguous. There can be no doubt that they fully express the intention of the parties; but there is in them no hint or suggestion of an agreement with General Burt, individually, to build a railroad. And yet the contention of the plaintiff is that the jury should be permitted to construct from the informal negotiations which preceded the written contracts an additional agreement, inconsistent with them, and wholly unnecessary to accomplish the desired purpose.

Remembering the different versions of this oral agreement given by the only witness who testified upon the subject, and in view of the numerous presumptions against it, it is a serious question whether the court would permit a verdict sustaining such an agreement to stand. But let it be conceded, as perhaps it must be upon a motion of this character, that such a contract was made, that the minds of the parties actually met, that it was the intention of the defendant to bind itself to General Burt, as well as to General Burt's company; yet it is entirely clear that it was still an agreement to build the road of the Consolidated Boston, Hoosac Tunnel & Western Railway Company, of which General Burt was the president. Divest the oral agreement of this element, and it lacks many of the essentials of a valid contract; it is vague, indefinite, and without consideration. The agreement was not to build a railroad for General Burt, to be owned by him as an individual; but it was, if anything, an agreement with General Burt to build a road for General Burt's railway company, pursuant to the terms of a contract to be thereafter made. The stock and bonds of this company were to pay for the work of building the road. The company's existence was necessary to give vitality to the contemplated project. It is, however, immaterial what interpretation is placed upon the agreement of May 25th, standing by itself; for, the moment it is read in the light of the contract of August 11th, all uncertainty regarding its import ceases. After that date there could be no doubt as to the party for whom the road was to be constructed. The agreement was then complete. Certainly, General Burt was estopped from saying, in the language of the plaintiff's brief, that "the contract was *not* to build the road of any particular company" after he, as president, had signed the contract to build the road of the consolidated company. It was in the contemplation of both parties that a valid railway company existed. It was an implied covenant on the part of General Burt. Upon this basis the contracting parties met. Is it not then entirely clear that, if there was no railway company, there could be no binding contract? The plaintiff cannot avoid the force of the decree of the state supreme court of July 16, 1883, declaring the railway consolidation void *ab initio*. That

decree was as comprehensive and drastic as language could make it. The attempted consolidation was declared illegal and void, and the association of persons wrongfully exercising corporate rights was dissolved. The mortgage, the bonds, the stock, and the leases issued or taken by the company were declared void, and were ordered to be canceled and destroyed. All persons connected with the association were enjoined from exercising any corporate rights. A receiver was appointed. The railway company was swept out of existence. There was not, and never had been, in legal contemplation, such a consolidated company as the Boston, Hoosac Tunnel & Western Railway Company. As it was out of the defendant's power, therefore, to build a railroad for this pretended corporation, which could not contract, and never had a legal existence, it was equally impossible for the defendant to fulfill the agreement with General Burt to build the road for such a corporation. If A. should agree with B. to build a manufactory for the C. & D. Company on its premises at the corner of two designated streets, it would probably be a defense to an action upon the contract if A. should show that there was no C. & D. Company, and that the premises in question were owned by another party; and such defense would hardly be met by the suggestion that A. might have organized another company, purchased another lot, and built a factory thereon, under a new contract which might have been made with the new corporation.

There is not the slightest pretense that the defendant promised to organize a new corporation if the one with which it contracted proved to be invalid, or that it agreed to build the road for six separate, independent corporations. Leaving out of sight the impossibility of floating a new loan, after the crash which followed the far-destroying judgment of the state court, it is enough to say that the defendant was under no obligation whatever, oral or written, to General Burt, or to any other individual or corporation, to attempt the construction of a new company out of the shattered fragments of the old. General Burt and the construction company embarked in a colossal enterprise, largely speculative in character. It failed, and involved in disappointment and disaster all connected with it. No reason can be suggested why one of the joint promoters of this project should saddle his losses upon his associates. Indeed, considering the ruin which followed General Burt's abortive attempt to organize a company, and his failure to pay a dollar on his subscription of $3,000,000 to the stock of the defendant, it might almost be said that justice would not be profaned if the position of the parties on the record were reversed.

The re-examination of the questions involved has only strengthened the opinion formed at the trial that the plaintiff is without a cause of action. The motion for a new trial is denied.